# IN THE MATTER OF THE WILL OF CHARLES NOTLEY, Deceased.

EXCEPTIONS FROM CIRCUIT COURT, FOURTH CIRCUIT.

SUBMITTED JULY 29, 1903.          DECIDED MARCH 8, 1904.

FREAR, C.J., GALBRAITH AND PERRY, JJ.

In deciding the question whether there is sufficient evidence of undue influence in the making of a will to go to the jury, the evidence must be considered in the light most favorable to the contestants; the proponents must be considered as admitting not only the facts which the contestants' evidence tends to establish but also every inference which a jury might fairly draw from such evidence; in order to justify the direction of a verdict for the proponents, there must be such insufficiency of evidence in fact as to amount to insufficiency in law; there must be an absence of material and substantial evidence, which, if believed by the jury, would in law justify a verdict for the contestants; the question is not whether the evidence shows in the opinion of the court that the will was procured by undue influence but whether it was such that the jury could reasonably have so found.

Although in order to set aside a will on the ground of undue influence, it must be proved that such influence operated at the very time of making the will, this may be shown by indirect or circumstantial evidence, but in such case the evidence must be of a very clear and convincing character.

The subsequent execution of a codicil, when such influence is not operative, expressly confirming the will, makes it immaterial that the will itself was procured by undue influence, if such were the fact.

Undue influence which will vitiate a will is distinguishable from mere influence and from mere bad influence. It must amount to fraud or coercion, or the substitution of another's will for that of the testator.

Where it was contended by the wife and children that the will and codicils of the husband and father were procured by the undue influence of a niece who had been brought up in the family as a daughter but where there was no direct evidence of even an attempt to influence the testator, whether duly or unduly, in the making of his will or codicils, and uncontradicted affirmative evidence that she was not present at the execution of the will or either codicil, and the uncontradicted evidence showed that the testator was of sound and strong mind, and the evidence, although it showed that there had been more or less friction in the family due in part at least to the presence and conduct of the niece and that the uncle and niece were very fond of each other and possibly that the latter had the disposition and opportunity to attempt to influence the former in the disposition of his property, yet did not show that she had a general controlling influence over him, and the will itself was not unnatural and its provisions were fully accounted for on other grounds than the undue influence of the niece, it was not error to direct a verdict for the proponents.

A testator may make even what is sometimes called an unnatural will if he does so freely and with a sound mind, but in this case the will was not of that character.

Mere suspicion or conjecture of undue influence is insufficient to justify nullifying an exercise of one's right to dispose of his property by will.

OPINION OF THE COURT BY FREAR, C. J.

(Galbraith, J., dissenting.)

The Circuit Judge, after a hearing, admitted to probate the will and codicils of the decedent, Charles Notley. The contestants, his widow and four children, Charles, William, Maria and David, appealed to the Circuit Court, and the case was there tried before a jury and a different Circuit Judge on the issue of undue influence by the decedent's niece, Mrs. Emma Danford, née Mullinger. At the close of the contestants' case, the proponents moved the Court to direct a verdict in their favor. This motion was granted and a verdict was rendered as directed. The question now raised by the contestants' exceptions is whether there was sufficient evidence of undue influence to go to the jury.

Mr. Notley had lived on the island of Hawaii half a century. He successively herded sheep, kept a store and tannery and cultivated sugar cane, and finally his property became of considerable value. He early took an Hawaiian wife, by whom he had a number of children, of whom four survived him. In 1885 he visited England, his native land, and brought back with him his niece, Emma Mullinger, then a child of about thirteen years, whom he brought up as a daughter. In October, 1898, Emma married and moved to Honolulu. The will was executed May 18, 1899; the first codicil, August 2, 1900; and the third codicil April 11, 1902. Mr. Notley died May 2, 1902.

The will gave $1000 to a Miss Barnard, who had lived at the Notley home for a time; $500 to the decedent's brother in England, with a gift of the same by way of substitution to the brother's wife and granddaughter successively; $500 to Emma Mullinger's father in England; the homestead, furniture, etc., on Hawaii to decedent's son David; the proceeds of an insurance policy in equal shares to his wife, his children, William, Maria and David, and his niece Emma; the residue of the estate to the executors in trust to pay the income thereof in equal parts to the wife, the said three children and Emma respectively, for their lives, and the children of the remaining son Charles, with various provisions by way of substitution, remainder, payment to the children of Charles upon their arrival at certain ages, freedom from the control of their husbands in the cases of Maria and Emma, etc., and finally, on the termination of all the life estates, the corpus was to be divided equally among the heirs of the three children, the niece and the children of the remaining son Charles. Thos. R. Walker and Anthony Lydgate were appointed executors and trustees. The first codicil substituted Cecil Brown as executor and trustee in place of Mr. Walker, who had left the Territory, and expressly confirmed the will in all other respects. The second codicil gave the homestead, furniture, etc., to Emma in place of David, with a proviso that the wife should have the use of a cottage on the premises, with its

furniture, for life, and expressly confirmed the will in other respects.

The features that are most objected to are that the niece, subject to certain conditions in favor of the wife, instead of the wife, was given the homestead, and that Charles' children, instead of himself, were given most of what would have been given to him if he had been treated like the other children and the niece. The wife, of course, was not bound by the provisions of the will and has in fact elected to take her dower instead, and does not join in this appeal.

The estate is valued at about $400,000 and the contest has been strenuous. The trial judge at the outset adopted the view of the contestants, which is doubtless the correct view, that great latitude should be allowed in the introduction of evidence in a case of this kind, and was extremely liberal throughout in allowing them to introduce evidence that of itself seemed trivial or irrelevant—on the possibility that its relevancy or materiality might eventually be shown by other evidence, or that the evidence might be sufficient as a whole to go to the jury, however weak in its several parts. Counsel for the contestants have in their arguments and briefs made the most of such evidence as they were able to produce. But after examining the lengthy transcript we are unable to find that the trial judge erred in directing a verdict for the proponents.

There is no doubt that in deciding the question whether there was sufficient evidence of undue influence to go to the jury, the evidence must be considered in the light most favorable to the contestants; that the proponents must be considered as admitting not only the facts which the contestants' evidence tends to establish, but also every inference which a jury might fairly draw from such evidence; that in order to justify the direction of a verdict for the proponents there must be such insufficiency of evidence in fact as to amount to insufficiency in law; that there must be an absence of material and substantial evidence, which, if believed by the jury, would in law justify a verdict for the contestants; that the question is not whether the evi-

dence shows in our opinion that the will and codicils were procured by undue influence, but whether it was such that the jury could reasonably have so found.

There is no direct evidence whatever that Emma ever attempted to influence, whether duly or unduly, Mr. Notley in the matter of his will. The only evidence of anything that ever passed between them on that subject is found in the testimony of his son Charles, to the effect that at the trial before the Circuit Judge Emma testified that she had no knowledge of any will being made, but that she later altered that by stating that Mr. Notley had told her that she was going to have the homestead and that she had replied "Thank you, uncle; I love the dear old place."

The will was executed at the office of Mr. Notley's attorney in Honolulu. The instructions as to its provisions were given to the attorney there. Emma was not present on either occasion. It may be that, as the contestants contend, he was then visiting at her home, though there is not any direct evidence as to that. After her marriage, he sometimes visited her and sometimes his daughter Maria, when he came to Honolulu. The will apparently differed from a former will in the one respect that the son Charles' children were substituted for him. The first codicil, substituting Mr. Brown for Mr. Walker as executor and trustee, and expressly ratifying the will, was executed on the island of Hawaii at a time when Emma was living with her husband on the island of Kauai. It was prepared by the attorney at Mr. Notley's request made by letter, though he had spoken about it before, and was sent to Mr. Notley who sent it back to the attorney for keeping after its execution. The second codicil, substituting Emma and the wife for the son David as to the homestead, was executed when Mr. Notley was visiting Emma. It was drafted from instructions given by Mr. Notley alone at the attorney's office, but was executed at Emma's home at the suggestion of the attorney, that he, the attorney, bring the codicil to the house for execution, because at that time exertion on the part of Mr. Notley brought on spells of coughing.

The attorney had never met Emma, excepting perhaps once casually a week or so before. Emma was not present at the execution, but brought pen and ink at Mr. Notley's request and then withdrew. Mr. Notley's wife also was staying with him at Emma's home at that time. Mr. Notley was evidently very careful in money and property matters and executed the will and codicils, as the evidence shows, only after giving them very careful consideration.

There being no direct evidence that the niece ever had anything to do with the making of the will or codicils even by way of suggestion, the contestants endeavor to show that Emma had had an unbroken, profound, dominating influence over Mr. Notley ever since he met her, and that that influence was of an evil and unnatural character, or, to state their contention in another way, that she had the power to influence Mr. Notley generally; that such influence being evil, in that it was exerted, as contended, in creating family dissensions and depriving the wife and children of natural rights, the presumption is against the rightness of her motives; that she showed a desire to influence the decedent in the matter of his will by threatening to Charles to do so in certain particulars; that she had opportunities to do so; and that the will itself shows that she accomplished her purpose.

There is no doubt, as was said in *Herster v. Herster,* 122 Pa. St. 252, quoting from an earlier case, "that the undue influence must be proved to have operated as a present constraint at the very time of making the will," and of course if either codicil was executed in the absence of such influence, it would be immaterial that the will itself had been executed under such influence, if such were the fact, for in such case the execution of the codicil would amount to a reexecution of the will at a time when the undue influence was not present. Underhill, Wills, Sec. 216. And yet direct evidence of such influence at the precise time of execution is not indispensable. That may be shown by circumstantial evidence. Mental weakness on the part of the testator and general control over him, and desire

and opportunity to control him in the disposition of his property by will may be shown—but only in so far as it tends to show that undue influence was in fact operative at the time of the execution, and in such cases the indirect evidence must be of a clear and convincing character; indeed, it is said that it must be not merely consistent with the theory of undue influence, but inconsistent with a contrary theory. Mere suspicion and conjecture are not enough. *Boyse v. Rossborough,* 6 H. L. Cas. 2, 50; *In re Langford,* 108 Cal. 608, 622; *Boggs v. Boggs,* 62 Neb. 274, 285; *Maynard v. Vinton,* 59 Mich. 139, 153; *Schuchhardt v. Schuchhardt,* 62 N. J. Eq. 710, 713; *Beyer v. LeFevre,* 186 U. S. 114, 126.

The question of the mental and even the physical condition or capacity of the testator is a most important one in cases of this kind. What will control one person's mind will not control another's. The question is whether the testator was in fact controlled by another in the making of his will. Any amount of evidence of desire and opportunity alone to exert influence will fall short of proof that the will was the result of undue influence. The question is whether the exertions, if there were any, were undue and effectual. A person of proper age and sound mind has a right subject to a few statutory limitations, to dispose of his property by will as well as by conveyance, and he should not be deprived of that important right by the acts of others through evidence adduced when he is gone and cannot be heard, unless the evidence clearly shows that his volition was in fact overcome by that of others. As is said in Redfield on Wills, p. 518, "these questions (of undue influence) will not be likely to arise, except in regard to persons, naturally of weak minds, or facile dispositions, or where such has become their condition, either from age or disease." And in nearly all the cases in which wills have been set aside on the ground of undue influence, the mental weakness of the testator has been an important element. In the present case not only was there abundant evidence that the deceased was of strong and sound mind and body, but this was uncontradicted. For instance, Dr. Her-

bert, his physician, who had known him eighteen years, testified that Mr. Notley "was peculiarly strong in his character; he was firm; he was a man who would impress you as not easily influenced by any one * * * he was a strong character * * * He was a strong man and not a weak man mentally and physically. * * * His mental condition during the six months preceding his death was exactly as it was during his previous life, clear and intelligent." Mr. Cecil Brown, his attorney, testified that he was as honest a man as ever walked this earth, a warm-hearted, kind-hearted man, just as sound as you or I, that he showed no indication of failing intellect, and had always been the same; that his illness, when he executed the second codicil, did not affect his mind in the least,—only when he walked too much it brought on fits of coughing.

Thus there is no direct evidence of any attempt at influence, not to mention undue influence, as to the making of the will or either codicil, but, besides the ordinary presumption against undue influence, there is in this case a very great improbability that any such attempt, if it had been made, would have met with success, considering the strength and soundness of the decedent, both mentally and physically. We now come to the question of undue influence itself. This must be distinguished, in the first place, from mere influence. The exercise of mere influence on a testator, even if it should be successful in leading him to make a will which he would not otherwise make, would not necessarily justify setting the will aside. Everyone is subject to influences. Ordinarily a person has a right to dispose of his property by will. If he complies with the statutory requirements, what purports to be his will cannot be set aside unless it is shown not to be his will. This may be made to appear either by showing that the person had not sufficient mind to make a will at all, or by showing that his volition was overcome to such an extent that what purports to be his will was not his will but another's. There must be fraud or coercion. *Boyse v. Rossborough, supra.* The testator must have been deceived or forced into doing what he would not otherwise have done.

"The undue influence for which a will or deed will be annulled' must be such as, that the party making it has no free will, but stands *in vinculis*. It must amount to force or coercion, destroying free agency." *Conley v. Nailor,* 118 U. S. 127, 136. The following from 1 Underhill, Wills, Sec. 144, is amply sustained by the cases:

"Every influence which is brought to bear by a legatee upon the mind of the testator, by means of which the former secures. a benefit, is not necessarily undue. The employment of argument or persuasion, directed to the understanding; of flattery,. addressed to the feeling of self-esteem, or of appeals to the affection or pity of the testator, will not constitute undue influence sufficient to vitiate a will which, upon the whole, appears to be the outcome of the free agency of the testator. Honest intercession and solicitation, though insistent and continuous during the period covering the execution of the will, if they do not result in coercing the testator into making a will which he would not have made voluntarily, are not undue influence. It is only when such pressure results in subverting the will of the testator to that of another that it is undue influence. Neither advice nor argument nor persuasion would vitiate a will made freely and from conviction, though the will might not have been made but for such advice and persuasion. Gratitude and affection growing out of benefits conferred or being conferred; esteem and friendship, the result of admiration for another's character, are allowed to have their proper operation upon the mind and volition of the testator. He has a right to keep his mind and heart open to the sweet influences of social ties and to the promptings of the natural love which he may have for those of his own blood. On the other hand, he has a right to listen to the suggestions and solicitations of persons not of his kindred, which have for their object the procurement of testamentary benefits at his hands. He may lawfully permit himself to be influenced by motives of friendship; he has a right to remember the claims of those from whose hands he has received favors. during his life-time; he may permit himself to be influenced by all those motives, or by requests based upon his gratitude for past benefits or present comforts enjoyed by him. His will should be sustained if, after listening to and deliberating upon the appeals and solicitations, his mind is free from restraint and coercion, and he is at liberty to act freely upon them, to

acquiesce in or to reject them, and his will, when it is executed, speaks his own mind and intention, voluntarily formed, and not those of another person or persons."

In the recent case of *Naoiwi,* 14 Haw. 43, this Court approved a charge to the jury which contained the following:

"Procuring a will to be made, unless by foul means, is nothing against its validity. A man has a right by fair argument to induce another to make a will, and even to make it in his favor. A will procured by honest means, by acts of kindness, by attention and by importunate persuasion which delicate minds shrink from would not be set aside upon that ground alone. It is only that degree of influence which deprives a testator of his free agency and makes the will more the act of others than his own which will avoid it. Neither advice nor argument nor persuasion nor entreaty will vitiate a will made fairly and from conviction, though such will might not have been made but for such advice or persuasion. Undue influence is not such as arises from affection or esteem, but it must be the control of another will over that of the testator whose faculties have been so impaired as to submit to that control and to such extent that he has ceased to be a free agent and has quite succumbed to the controlling power of the mind or will. * * * Before this will can be set aside you must believe and find from the evidence that at the time of the execution of the will the mind of Nalimu Naoiwi was so under the control and influence of her husband D. Naoiwi, that she could not if she had wished have made a will different from this; you must believe that she had not sufficient strength of mind to resist such influence exerted by Naoiwi at the time of the execution of the will."

Undue influence in the law of wills must be distinguished likewise from what is commonly spoken of as bad influence.

"In a popular sense," it is said in *Boyse v. Rossborough, supra,* "we often speak of a person exercising undue influence over another, when the influence certainly is not of a nature which would invalidate a will. A young man is often led into dissipation by following the example of a companion of riper years, to whom he looks up, and who leads him to consider habits of dissipation as venial, and perhaps even creditable; the companion is then correctly said to exercise an undue influence. But if in these circumstances the young man, influenced by his regard for the person who had thus led him astray, were to make a

will and leave to him everything he possessed, such a will certainly could not be impeached on the ground of undue influence. Nor would the case be altered merely because the companion had urged, or even importuned, the young man to so dispose of his property; provided only, that in making such a will the young man was really carrying into effect his own intention formed without either coercion or fraud."

The same is true in the case of a testator or grantor who, though having a wife and legitimate children living, has lived in illegal intercourse with another woman. The influence of such a woman, though extremely undue in one sense, is insufficient to vitiate a will or deed, in the absence of proof that the mind of the testator or grantor was overcome, although the deed or will would be more open to suspicion in such a case than in other cases. *Conley v. Nailor, supra.* Of course, we do not imply that the will and codicils in question were the results of either mere influence or bad influence. We are now merely pointing out the nature of undue influence.

Bearing in mind, then, that there is no direct evidence of even an attempt at influence in the making of the will and codicils, that the testator was of strong mind, and that influence, in order to vitiate a will, must be such as to overcome the will of the testator by fraud or coercion, what is the nature of the evidence relied on to show such influence? It would be impracticable to set forth all the evidence or the elaborate arguments which the reason and imagination of counsel have built upon it, and yet perhaps we should indicate its general nature. It is designed in general to establish Emma's alleged long continued and complete dominion over the decedent, and the evil, unnatural character of that influence.

According to Mr. Lydgate, who was perhaps the most reliable witness on these points, Mr. Notley was very strict with Emma and often sharply corrected her for not doing what he had told her to do and saw to it that she obeyed his commands and he apparently thought the Notleys were as much to blame as Emma for what trouble there was. But Mr. Lydgate was one of the proponent's witnesses. We are now concerned with the contest-

ants' evidence. There is no doubt that Mr. Notley and Emma were fond of each other and that there was more or less trouble in the family and that this was due in part to Emma's presence or attitude there. That that should be so to some extent is not altogether surprising, considering the differences in education and tastes between an English girl brought up in England and an Hawaiian and part Hawaiians brought up in Hawaii. Emma may have been somewhat "stuck up" and the others were more or less jealous of her. The evidence seems to indicate that the troubles were due quite as much to their attitude towards her as to her attitude towards them, perhaps more so. If the testimony of the contestants' witnesses is true, Emma said and did things at times that she certainly ought not to have said or done. That is true of some of the Notleys also. But that is not the question. The question is whether she had dominion over Mr. Notley. A large number of incidents were brought out in the evidence, and yet perhaps not so very many when we consider that they were spread over a period of seventeen years. Those who testified to these were chiefly the Notleys themselves. Neighbors in a country district and relatives do not seem to have known that things in the Notley family were in the horrible state claimed. Mrs. Notley herself, whose ill-treatment by Emma is contestants' main reliance, was not called as a witness. Some of the incidents were trifling and remote, some were entirely unconnected with Mr. Notley or, if connected with him, unconnected with Emma, some tended to show on cross-examination of the witnesses that Emma was not at fault and that she often failed in having her own way even when very insistent. She is assumed to have been to blame for everything that went wrong.

It is contended that the status was ideal in the family prior to Emma's advent, that upon her arrival there was a marked change, that she brought about an estrangement between Mr. Notley and his wife and children, usurped the wife's position as mistress of the household, and practically drove her and the children out, depriving them of vital rights and privileges. The

witnesses relied on chiefly to show that former conditions were ideal seemed to think not that they were unusually good, but that they were such as are found in ordinary happy families; they testified mostly in regard to a period some years before Emma's arrival and one of them said that there had been trouble once over some Portuguese girls who were treated more as guests than as servants. One of the evidences of the complete change was, as contended, that there was often evening singing in the family before but not after her arrival, and yet, when she arrived, William was confined to a cottage in the yard as a leper and not long after went to the leper settlement on Molokai where he has been ever since; David a few months after Emma's arrival went away to school in California, Emma herself having been away at school in Honolulu much of those few months; and Maria had married and left the home several years before. Charles and his wife, however, were there. It was Charles' wife who testified that the singing stopped, referring particularly to the first six months after Emma's arrival during much of which time Emma was away at school—and she says that she, the witness, did not then remain long in the parlor evenings because she had to go to her children. Emma's complete control was evident at the very beginning, it is contended, because Mr. Notley writing from England, spoke of her as "a very nice girl" and "crazy" to come with him even against the objections of her mother; and on their arrival from England he took her with his wife and daughters to a restaurant, and Emma whispered something to him, whereupon he asked for a clean tablecloth— which, as contended, he had never done before—and because the waiter would not bring one, he left and took the others elsewhere for lunch. It is true, as contended, that he was proud of his boys before and even adopted the name of "Chas. Notley & Sons" in his business, though apparently without giving them an interest in the business, but there is no lack of evidence that he was proud and fond of all his children up to the time of his death, except of Charles, whose own conduct gave ample cause, as he believed, for his displeasure, and he treated even Charles

almost munificently in a financial way and otherwise treated him kindly after he had disgraced his father's name, as Mr. Notley believed. This is shown by his affectionate letters, his gifts, his visiting them and having them visit him, and by the direct testimony of many of the contestants' witnesses. There was at times trouble between Mr. Notley and his wife, and the wife and Emma. It is contended that Emma practically displaced her. Mrs. Notley was an Hawaiian—a faithful, hardworking woman, but apparently incapable of rising with Mr. Notley's circumstances. She ate Hawaiian food mostly, sat on the floor, would not ride in a carriage, and did not learn English during forty-three years of married life with Mr. Notley. It is true she spent much of her time washing and ironing in an out-house after Emma's arrival,—but it is equally true that she did before that and after Emma left. She often, but not always, ate away from the family table after Emma came—especially when she ate Hawaiian food—which she usually ate, but she did this—doubtless not to the same extent—before Emma's arrival and after her departure. Emma was placed in charge, but not until seven years after her arrival, and long before her arrival the daughter Maria seems to have had special charge of the house while the wife did the washing, and after Emma left, after being in charge five years, the granddaughters, children of Charles, and not Mrs. Notley, were placed in charge, and, according to the testimony they were treated in all respects just as Emma had been. When Mrs. Notley was told by Charles that Emma had been placed in charge, she replied, "Is that so?" as if it did not make much impression on her. Just how much ill-feeling existed between Emma and Mrs. Notley is doubtful. They were together more or less at the table, in the parlor, riding, traveling, &c. Emma wrote for her to come to Honolulu when Mr. Notley grew worse in his last illness and she came and stayed at Emma's house some weeks. There is testimony that they did not often speak to each other, that they passed as strangers, though all agree that Mrs. Notley could not speak English and Emma could not speak Hawaiian. A Portuguese

who worked for the Notleys when he was a boy, the only witness outside of the Notleys as to the troubles after Emma's arrival, testified that he never saw any conversation between Emma and Mrs. Notley, and "no good faces", but he says also that they could not speak each other's languages, that he never heard Emma say anything cross to any of the Notleys and that she always conducted herself as a lady. He said also that Mrs. Notley often talked to herself and cried and that Mr. Notley and Emma did not appear to be moved by it. Once Emma asked a lady school teacher who took meals at the Notley's to excuse Mrs. Notley for going around in a chemise, thus showing her disposition to undermine Mrs. Notley, and once she told this school teacher, who was an American, that she preferred the English to the American accent of "neither", and the school teacher stopped taking her meals there a day or two after,— whether because of this, or whether, against Mr. Notley's desire, because Emma did not like the school teacher and wanted her to go, does not appear. An attempt was made to show that Emma on one occasion had her servant burn an album that belonged to Mrs. Notley, but it appeared that the servant was a regular household servant, though at a time when Emma was in general charge, that it was at a general cleaning up shortly before Emma's marriage, and there was no evidence to show that Emma knew anything about it. On another occasion when Mrs. Notley "ate rather ravenously" after a long fasting and seasickness, Emma, it is said, looked disgusted and remarked, "Why does aunt eat so?" On another occasion after some conversation, in which Mr. and Mrs. Notley and Emma took part, Mr. Notley ordered some rose bushes pulled up to make way for a tennis court. There were tears rolling down Mrs. Notley's cheeks. She had brought water for these roses from some distance in dry seasons. The witness, the Portuguese boy above mentioned, said that he did not know what was said in the conversation, and Mrs. Notley herself was not called as a witness. Mr. Notley once took Emma to the Volcano—where it is said he had never taken his wife. On two

occasions he is said to have struck his wife.  One of these was
in January, 1888, more than eleven years before the will was
executed, when, because of a disagreement over some crockery
that had been loaned to a neighbor, Mr. Notley struck his wife,
knocking her down, and was very repentant immediately after-
wards.  On this occasion Emma, who was in the yard just after
returning from the neighbor's, and who apparently did not see
Mr. Notley strike his wife, but saw there was trouble, called to
him to "drive that black woman out of the yard, do, uncle, do."
One of the witnesses thought that Mr. Notley, who was some
distance away and excited, did not hear this, and testified that
Emma never before or after called Mrs. Notley a black woman.
The other occasion was in February, 1899.  It seems that
Emma,—during a visit to the Notleys after her marriage,—
had recommended having Miss Barnard come to the house and
teach the granddaughters music, &c., and be a companion to
them.  One of the granddaughters testified that, about a week
after Emma had returned to Honolulu, she heard Mr. and Mrs.
Notley talking about pictures and Miss Barnard in another
room and the words "take that" and what seemed like clapping
hands and that Mrs. Notley's eyes were swollen, though not so
much as to prevent her from going to church the same day.
Several other incidents occurred the same month.  Mr. Notley
was to accompany Emma back to Honolulu.  His trunk and
valise were packed and the carriage was at the door.  Mrs. Not-
ley said that she did not want him to go, that Emma had a hus-
band who could come and take her back himself.  She pushed
Emma aside and pushed Mr. Notley into a chair and held him
there.  Some of his vest buttons came off.  Emma cried and
said it was the last time she would come there; also, "Who is
this woman that you should listen to her?"  Mr. Notley did not
return with Emma, although counsel contended that "he enter-
tained such confidence in her that he never once opposed her
will."  Another incident that occurred the same month arose
out of a scandalous rumor in regard to some ladies.  The man-
ager of a neighboring plantation came to the house and charged

Charles with it, and another called him a liar. Mr. Notley also called him a liar and wanted him to apologize, but he said that he did not make the alleged scandalous statement and declined to apologize. He (Charles) also testified that the ladies in question were friends of Emma, but that he did not know whether she had anything to do with originating or circulating the story. Referring to the trouble about Miss Barnard just mentioned, Charles also testified that Emma had tried to persuade him that Miss Barnard ought to come, and that he and Mr. Notley had talked the matter over afterwards and that the latter "began to get mad and said he owned the place, he was boss of the place and he would do just as he pleased." "He got furious and said if he could not do as he pleased he would shut up shop and leave." "He said, 'Well, we had planned with your cousin (Emma), that is our plan. If I cannot do it I will shut up shop and leave'." But Miss Barnard did not come. Going back to 1888, about two weeks after the incident in regard to the crockery, there was some trouble in which Charles and Emma and the same neighbor as in the crockery matter were concerned. What the trouble was does not appear, but Charles' wife testified that at first Mr. Notley believed Charles and later Emma and then turned Charles and his wife out but after four days he believed Charles again and had them come back and was then very angry with Emma and left shortly after to take her back to England but that after getting as far as Honolulu, he placed her in a family there to be educated and returned home himself. Charles and his wife had been turned out once before, in 1886, by Mr. Notley because his (Charles') wife would not sew for Emma. In 1897, it is contended, Emma tried to have one of the granddaughters, who was visiting the Notleys sent home. She was exercising a supervision over her as well as over two younger granddaughters. It seems that the granddaughter was somewhat ill and that Emma attributed this to too much horseback riding and in the presence of the granddaughter telephoned to the latter's father in Kohala that she was ill from too much horseback riding and did not obey her

(Emma). Mrs. Notley, however, protested and wailed and succeeded in preventing the granddaughter from being sent home. It seems also that Emma had brought the granddaughter from Kohala and accompanied her on her return later. This granddaughter testified also that Mr. Notley was very kind to her, kissed her, &c., and treated everyone there alike, namely, his wife, Charles' four children, Emma, Miss Barnard, and herself; also that on one occasion Emma told one of Charles' children that she was more to Mr. Notley than his wife, that once Emma told the granddaughter that it was not ladylike to sit on Mr. Notley's lap, but that upon her going away and returning she found Emma in her place, and that once Emma told her that Mr. Notley preferred to be alone at his morning meal after the granddaughter had twice taken coffee with him. Another granddaughter testified that she once found Emma listening near the door when Mr. Notley and another gentleman were talking in the parlor, but that she, the witness, had done the same thing when Mr. Notley and his wife had disputes. Other incidents relied on to show Emma's controlling influence were these: On one occasion Mr. Notley made some plans for an addition to the house, which his son David was to build. David proposed changes in the plans but Mr. Notley did not accept them, but when they were all talking the matter over at the table Emma proposed the same changes and Mr. Notley adopted them. The Portuguese mentioned testified that sometimes when Mr. Notley was talking with his wife in the ironing room, he heard Emma's voice calling for him and that he always went when so called—whether to the telephone or to see a caller or for what does not appear. On another occasion on her return from a drive Emma said that she liked the horse very much and was going to ask Mr. Notley for it, and, on being told that she probably would not succeed in getting it, replied that she would get it just the same, and after a while the witness saw the horse in her possession. This witness said also that he was told by his sister Maria that Mr. Notley gave her also a horse at the same time. To show Emma's influence over Mr. Not-

ley, much is made of his alleged indifference of attitude towards the others on several visits to Honolulu. In December, 1900, he visited Maria, and was more like his old self and gave many Christmas presents. Emma was then on Kauai. But in April following, when Emma was in Honolulu, he was cooler, and in October following when he was at Emma's house he was cooler still. But it also appeared that he wrote Emma about the good time he had had at Christmas with the others, and in April he not only visited Maria, though Emma was in Honolulu, but gave a bicycle to each of Maria's four children, though it was not Christmas time, and in October he called at Maria's about twice a week though he was staying with Emma. But it is said that when he drove by Maria's place in October he would look in when Emma was not with him but not when Emma was with him. Perhaps the two most important incidents relied on are the following to show her connection with the will. Just before Emma's wedding, according to Charles, he was preparing to get the dancing tent ready and to decorate with ferns, when Emma came out and said that she did not think there was any use in going on with the preparations as Maria had telephoned that she would not come because Emma was described as daughter instead of niece in the invitations, and Emma said that it was very funny, and that she had thought that the others always took her in as a sister, but Charles replied that he had not, and that he had learned that Mr. Notley had bought property in her name in Honolulu (a $5000 home as a wedding gift) and that he, Charles, did not think it was right towards his mother. Emma said she did not know of it and that if that was the way he thought of Uncle, she would see that he did not get anything out of this property. She also said that she had adoption papers, which Charles says he did not know of before. Charles told her he did not know who she was. He testified that he must have insulted her then, that he was mad because his father bought the property and that he did not doubt that Emma knew nothing about it beforehand. The other occasion was in February, 1899, when in Mr. Notley's hearing she, being worked up, said

to Charles that she would see that Miss Barnard would get
something out of the property, and Mr. Notley thereupon said
to her, "get back, get back." Several incidents are relied on
to show that Mr. Notley confided in Emma and discussed his
plans with her to the exclusion of the family. For instance,
Maria testified that in 1898 when she and Emma were talking
of different things the latter mentioned that Mr. Notley in-
tended to take a trip to New Zealand, but did not know whether
he would go then or not, and that this was the first time she, the
witness, had heard about it, but she also testified that Mr. Notley
himself afterwards spoke to her about it—and whether she had
not learned of it before because she was away from home, or
whether Mr. Notley had spoken of the trip to other members
of the family, does not appear. It is contended that in the boom
times in 1899 he let Emma but not the others know of an option
he gave to Mr. Andrade on his Hawaii property for $1,000,000.
That option was negotiated at Emma's house but not in Emma's
presence. The proposition came from Mr. Andrade. A clause
was inserted in the agreement to the effect that Mr. Notley did
not guarantee a release of his wife's dower. He told Mr. An-
drade that he would try and secure a release but that he should
keep the matter secret because his son Charles was a rascal and
had more influence with his wife than he had and might knock
the plan on the head. Later he wrote to his son William, who
had written about the option, and denied that he had offered
to sell his property, but also wanted to know who had told him
and that he, Mr. Notley, did not have anything to do with
Charles because he, Charles, had treated him like a brute. Later
he apparently told David about it and tried to get him to use
his influence with Mrs. Notley, to secure a release of dower,
and gave him $2000 and spoke to him in much the same way
about Charles. Likewise it is contended that he discussed his
will with Emma but not with the others. This is shown, it is
contended, by the fact that he told Emma that she was to have
the homestead—which he gave to her in the second codicil. But
it also appears that he had twice spoken to his daughter Maria

in regard to the subject of the first codicil before executing it. Considerable is made of the contention that Emma practically ostracised David—forcing him to be a mere dock laborer, but she and David appear to have been very friendly, and Mr. Notley had expressed gratification that David was the only son that had not squandered his money and had admired him because he was working on the docks, and David himself says that his father took him to dine with him on Sundays, when in Honolulu, that he lived in a house that was under his father's control, that he obtained through his father's influence a government job which he held six or eight years, that when his father engaged him to build an addition to the house on Hawaii he returned to Honolulu of his own accord, that he worked on the docks of his own volition, and that he did not blame either Mr. Notley or Emma for it, although he does say that his father once refused to pay a doctor's bill for him, and once refused to take him to the plantation to work, but also that besides the $2000 above mentioned his father gave $5000 to him as well as to each of the other children in 1897. To show that Emma was scheming all along for the decedent's property and cared nothing for him, it is shown that on the night before he died Emma said she would have nothing more to do with him after he was dead, and that the funeral was held at the undertaking parlors. This remark is rather ambiguous. Whether she meant that she did not want anything to do with him or that the members of the family and not she would have the decision as to the funeral arrangements is not clear. Emma proposed that his body be taken home to Hawaii and buried at the church he had helped to build. Maria, the witness on this point, thought it a good plan and suggested it to the mother. The latter, however, did not like it. And then Emma made the remark mentioned. Whether she declined to have the funeral at her house or not, or why it. was not held at Maria's does not appear. It does appear that when Mr. Notley was ill on Hawaii she was sent for by Mr. Lydgate, who represented that he was not receiving the attention he needed—not because the wife and granddaughters did not do all

they could but because they were not sufficiently skilled,—that she went up and took care of him, that he improved and was brought to Honolulu, that she nursed him until a trained nurse was obtained, that she wrote to Mrs. Notley to come down when he got worse, that the latter came and stayed at Emma's house until Mr. Notley's death, and that David called after the funeral to thank her, Emma, for what she had done for his father.

The foregoing comprise nearly all the incidents relied on by the contestants, but of course without all the shadings and settings, or the embellishments of counsel's arguments. Comment on them is hardly necessary, except to say that in most instances the first statements—unsatisfactory enough in themselves,— were so qualified and explained later by the contestants' own witnesses as to remove most of what little force they would otherwise have. All that is necessary is to read them in the light of the principles, above set forth, of the law of undue influence in connection with wills. There is considerable evidence of something, but of what? A jury might be justified in finding that Emma's presence and conduct produced a decided change for the worse in the Notley family, that she and Mr. Notley thought a great deal of each other, and even that she had the disposition and opportunity to try to influence him in the matter of his will, but not that he was weak-minded or that she had a general control over him, or that she did control him or substitute her will for his in the final disposition of his property.

But, it is contended, the will itself is a loud witness—it is "unnatural" and "reeks and drips with undue influence" and carries out Emma's previous threats. First, $1000 out of $400,000, perhaps twice that value at the date of the will, is given to Emma's friend, Miss Barnard, but it may be added that Miss Barnard was also a friend of Mr. Notley. She had lived near by, as a school teacher. On the death of the one with whom she was staying, Mr. Notley invited her to his house, where she remained a long time. One of the contestants' witnesses says that Mr. Notley treated her like the rest at his home. When Emma said that she would see that Miss Barnard got

something, Mr. Notley rebuked her.  When she tried to have Miss Barnard become an inmate of the Notley home a second time, she failed.  Whether she ever spoke to Mr. Notley again about Miss Barnard's getting something, does not appear.  If she did, and even if he inserted the item in the will in consequence, there is nothing to indicate that he did so because, not wishing to, he could not resist.  Secondly, it is said that Emma prevented Mr. Notley from giving his own brother more than $500 and compelled him to give her father, the husband of Mr. Notley's sister, that amount—as much as to his own brother. No comment is necessary—especially in the absence of any evidence as to the circumstances of the brother and brother-in-law or of Mr. Notley's inclinations towards them.  As to the main provision of the will, it is not strange that he treated Emma like the other children, considering what she had been to him for fourteen years; it is true that he gave her as much as the wife, but he also gave the others the same; that he did not give his wife more is perhaps not strange, considering her advanced age and simple tastes.  As to the homestead, while he did not give that to his wife, he did not give it to Emma by the will.  As to Charles, he himself repeatedly indicated sufficient reasons for leaving him out.  These were stated by him not only to Mr. Lydgate and Mr. Brown but to his children, William, David and Maria, and to Mr. Andrade.  He felt that Charles had disgraced his name by defaulting when employed in the customs house at Hilo, and he had to pay $7000 to clear him.  He said that he resigned from the constitutional convention or the Legislature because of the disgrace brought on his name.  He blamed Charles for the trouble between himself and his wife. He blamed him for squandering his money.  He called him a rascal to Mr. Andrade.  He had, as shown above, had difficulties with him at home.  And yet he gave to Charles' children what he did not give to Charles, except as to the insurance.  As to the first codicil it is contended that Emma had the testator substitute for one of the executors another who was not a member of the family, but the substitute was a friend and the attorney

of Mr. Notley and accepted only at the latter's earnest request and Emma had then never even met him, and the substitution was made when Emma was hundreds of miles away, and neither of the persons previously named as executors were members of the family, and the facts stated above are ample to explain why Mr. Notley did not wish to appoint Charles, who alone, it is contended, would have been appointed but for Emma, because the testator had twice told Maria that he thought some of appointing Charles.   As to the second codicil, the homestead, while not given to the wife, was not taken from her, but was taken from David, with whom Emma was most friendly, and the wife to whom Emma was perhaps most hostile was given what she was not to have before—a life interest in the cottage which she had long occupied.   The homestead was apparently not of very great value.   The objection is that it was not given to the wife.

The will may not be commendable. It may not be what a jury might think it should be, but it is not unnatural in the sense contended.   The question is not what the testator ought to have done or what Emma ought to get, but whether the right of the testator to dispose of his property as he pleased, subject to statutory limitations, may be taken from him on mere suspicions or conjectures and that, too, when he can not be heard.   The following is from *In re Langford,* 108 Cal. 608:

"The consideration of the question whether or not a will is 'unnatural'—by which is meant, we suppose, different from what it might have been expected to have been—is of no importance except in a case where there is some evidence immediately tending to show mental incapacity, fraud or undue influence; in which event it might serve to help out a weak case.   But there is no evidence in the case at bar that could be thus helped out. A will cannot be upset *because* in the opinion of a jury or court it is unnatural.   In the opinion of the McDevitt case it is said: 'Although I do not think it of special interest here, it is well to remember that one has the right to make an unjust will, an unreasonable will, or even a cruel will.   Generally, such questions turn our thoughts, as they are often intended to, from the only question at issue, which always is, only, Is the will the sponta-

neous act of a competent testator? Of course, juries lean against wills which to them seem unequal or unjust. But the right to dispose of one's property by will is most solemnly assured by law, and is a most valuable incident to ownership, and does not depend upon its judicious use. The beneficiaries of a will are as much entitled to protection as any other property owners, and the courts abdicate their functions when they permit the prejudices of a jury to set aside a will merely upon suspicion, or because it does not conform to their ideas of what was just and proper.' * * * And indeed, if it were important to consider it, we do not see how the will in the case at bar can be considered unnatural in such extreme case as to be remarkable. At the time of the execution of the will the contestants—children of the first wife—were all grown up, middle-aged people, with families of their own. He had seen but little of them after his marriage, and in a few years afterward he had moved away from them to California. They had strenuously opposed the marriage, and had said unkind things to his wife; and, as was very natural, there was not much social intercourse between the families afterward. * * * Of course, the contestants attribute this to the influence of the appellant, and they testify to statements which they say the decedent made to them tending to support that view; nevertheless the fact was that they came to California against his protests and thereby greatly displeased him. * * * Looking through the transcript in this case we see no evidence at all sufficient to warrant a jury in annulling the solemn acts by which the decedent executed his will, and republished it in the codicil. If the law is to be changed, and the right of disposing of one's property by will, the policy of which has been sanctioned by the wisdom and experience of many generations of men, is to be taken away, that result must be effected by the legislative department of the government. As the law now stands that right cannot be frittered away after the death of the testator according to the tastes and notions of others. It is quite likely that in the case at bar the provisions of the will did not meet with the approval of the jurors; but their approval was not necessary."

*In Cauffman v. Long*, 82 Pa. St., 72, the following language is used:

"The growing disposition of courts and juries to set aside last wills and testaments, and to substitute in lieu thereof their own notions as to what a testator should do with his property, is

not to be encouraged. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of it. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. In many instances testamentary dispositions of property seem harsh, if not unjust, the result, perhaps, of prejudice as to some of the testator's kindred, or undue partiality as to others. But these are matters about which we have no concern. The law wisely secures equality of distribution where a man dies intestate. But the very object of a will is to produce inequality, and to provide for the wants of the testator's family; to protect those who are helpless; to reward those who have been affectionate, and to punish those who have been disobedient. It is doubtless true that narrow prejudice sometimes interferes with the wisdom of such arrangements. This is due to the imperfections of our human race. It must be remembered that in this country a man's prejudices are a part of his liberty. He has a right to them; he is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, but is the uncontrolled act of his own mind, it is not to be set aside in Pennsylvania without sufficient evidence, nor upon any sentimental notions of equality."

The contestants rely in general on two classes of cases. The principal case in one of these classes is *Dean v. Negley,* 41 Pa. St. 312. This is cited to show that while the influence of a lawful relation over testamentary dispositions may be proper, that of an unlawful relation is not proper, the contention being that Emma was a continuing trespasser in the Notley home. Of course, there was nothing unlawful in Mr. Notley's taking his niece and bringing her up as his daughter. The case relied on belongs to the class in which a devise or bequest is made in favor of one with whom the testator has lived in illicit intercourse. No doubt such adulterous cohabitation may be shown—to be considered on the question of undue influence in connection with other circumstances, although a testator may lawfully

leave all his property to his mistress to the exclusion of his lawful wife, subject to statutory restrictions, if he does so with a free and sound mind. Most authorities do not go as far as the case cited, and even that case not only contains strong language in support of the views we have expressed in this opinion, but differs greatly from this case in its facts. There the relation was unlawful; here not. There the testator was of weak mind; here not. There the beneficiary was a strong woman, who had controlled the testator in other business matters; here not. See *Conley v. Nailor,* 118 U. S. 127, cited above; *Arnault v. Arnault,* 52 N. J. Eq. 801.

The other class of cases relied on is represented by *Rollwagon v. Rollwagon,* 63 N. Y., 504; *Tyler v. Gardner,* 35 N. Y. 559; and *Delafield v. Parish,* 25 N. Y. 9. These cases are cited on the question of general influence and other incidental questions. They differ from this case as white from black. Counsel rely largely on isolated expressions contained in these cases. It will be impracticable to set forth all the respects in which the facts differ from those in this case. By way of illustration we may mention that in the *Rollwagon* case, among other points of difference, the testator, an uneducated man of great wealth, who had married his housekeeper not long before, more at her seeking than his, and who was entirely dependent on her, was a confirmed invalid and so far gone that he could not speak, and the wife sent for the attorney and gave him all the instructions as to the contents of the will. The wonder is that there were dissenting opinions in these cases. In the *Gardner* case, for instance, all the members of the Supreme Court and three members of the court of appeals held that the charge of undue influence was not made out. Other cases above cited in this opinion are much more in point. Special attention may be called to one of them, a very recent case decided by the Supreme Court of the United States, *Beyer v. LeFevre,* 186 U. S. 114. That was a case in which the testatrix, after giving five dollars each to two sisters and a niece, left all the rest of her property, including the homestead, to a nephew and niece, whom she had brought

up, to the exclusion of her husband, but on condition· that they should provide a home for him. In the trial court a jury found against the will on the issue of undue influence. On appeal the Circuit Court of Appeals sustained the decree based on the verdict. The case was a much stronger one for the contestants than the present case in several important respects. The language of the Court on the various phases of the case is so peculiarly applicable to the present case that we would like to give it in full, but this opinion is already too long. The Court referred to its rule not to examine the facts when both the trial and appellate courts below agreed and especially when in the first instance the facts had been found by a jury, but said that at the same time it was the right and duty of the court to set aside a verdict when it was wholly unwarranted by the testimony, and then after reviewing and commenting on the facts, concluded as follows:

"One who is familiar with the volume of litigation which is now flooding the courts cannot fail to be attracted by the fact that actions to set aside wills are of frequent occurrence. In such actions the testator cannot be heard, and very trifling matters are often pressed upon the attention of the court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere we wish it distinctly understood to be the rule of the Federal courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason therefor."

A number of exceptions were taken to rulings rejecting or admitting evidence. These need not be considered in detail. The rulings were either correct or else were harmless errors in the view that we take of the case.

The exceptions are overruled and the case remanded to the Circuit Court for such further proceedings as may be proper and consistent with this opinion.

*Holmes & Stanley, C. Brown* and *G. A. Davis* for proponents.
*Kinney & McClanahan* and *J. J. Dunne* for contestants.

### DISSENTING OPINION OF GALBRAITH, J.

I am constrained to withhold my assent to the judgment of the Court in this cause as well as to the reasoning on which it is based although I agree that the rules of law quoted and cited are in the main correct and well established but the application made of those rules in this case is, in my opinion, clearly erroneous.

It is undoubtedly true, as stated by the majority, that, "In deciding the question whether there is sufficient evidence of undue influence in the making of a will to go to the jury, the evidence must be considered in the light most favorable to the contestants; the proponents must be considered as admitting not only the facts which the contestants' evidence tends to establish but every inference which a jury might fairly draw from such evidence." In other words, a motion to direct a verdict, like a demurrer to the evidence, admits not only what the testimony proves, but also every conclusion or inference a jury might fairly or reasonably draw therefrom and in the consideration of such motion the court should take that view of the evidence most favorable to the party against whom it is directed and should deny the motion when reasonable men might fairly differ as to the effect of the facts proved or in the inferences to be drawn from them or when in any view of the evidence the party against whom the motion is directed should prevail.

These principles applied to this case do not justify shading the evidence in favor of the proponents or taking that view of it most favorable to them. For instance, these principles do not warrant the deduction that the son, Charles, was disinherited on account of the Hilo Custom House episode—whatever that was —in 1895, since it is clear that there was a reconciliation between him and his father after that for the latter invited Charles and his family to return to the homestead to reside and they did return there and remained during the greater part of the years 1896, 1897 and 1898. Again in 1897 when the decedent gave each of his children and Miss Mullinger five thousand

dollars, Charles was included and treated the same as the others. Is it not more reasonable to infer that the cause of Charles' disfavor with the decedent arose subsequent to 1897 ? Was it caused by Emma Danford's dislike for Charles and by undue influence exerted by her over decedent or by some other influence ? Whatever the cause may have been I am not able to say under the evidence that reasonable men would agree in their conclusion or attribute it to the same cause.

The testator died May 2, 1902. The will and codicils admitted to probate as his last will and testament were as follows:

"Know all men by these presents, that I Charles Notley, of Paauilo, in the District of Hamakua, Island of Hawaii, being of sound and disposing mind and memory, do make, publish and declare this my last will and testament, hereby revoking and making null and void all wills by me heretofore made.

"I hereby nominate and appoint Thomas Rain Walker, of Honolulu, Island of Oahu, and Anthony Lidgate of Paauilo, in the Island of Hawaii, to be the Executors and Trustees of this my last will and testament, to serve as such without giving bonds.

"First.   I give, devise and bequeath unto Miss Josephine M. Barnard of Laupahoehoe, Island of Hawaii, the sum of One Thousand Dollars.

"Second.   I give, devise and bequeath unto my brother John Notley of Edgervare Road, Burnt Oak, London, England, the sum of Five Hundred Dollars; but in the event of my said brother John dying before me, then I give, devise and bequeath said sum of Five Hundred Dollars to Charlotte Notley, the wife of my said brother John, and in the event of the death of the said Charlotte Notley before me, then I give, devise and bequeath said sum of Five Hundred Dollars to Ada Baker of Edgervare Road, aforesaid, the granddaughter of my said brother John and his said wife Charlotte Notley.

"Third.   I give, devise and bequeath unto John Mullinger of South Lopham, County of Norfolk, England, the sum of Five Hundred Dollars.

"Fourth.   I give, devise and bequeath unto my son David Fyfe Notley and his heirs my homestead lot or dwelling house and premises situate at Paauilo aforesaid, together with all and singular the furniture, crockery, plate, pictures, linen and

household furniture of every kind as well as all carriages and other vehicles used for pleasure or otherwise, being in and upon the said building and premises.

"Fifth. I give, devise and bequeath to my wife, Mary K. Notley, and my children William Notley, Maria, the wife of Thomas Hughes, and David Fyfe Notley, and my niece Emma Danford, neé Mullinger, the proceeds in money arising from and out of the Policy of Insurance on my life No. 126095 in the New York Mutual Life Insurance Company, share and share alike.

"Sixth. All the rest, residue and remainder of my estate, real, personal or mixed, and wherever situate, I give, devise and bequeath unto the said Thomas Rain Walker and Anthony Lidgate, in trust nevertheless for the uses and purposes herein set forth, that is to say: to pay the rents, issues and profits arising from and out of my said estate in manner following:

"One-sixth thereof to my wife Mary K. Notley during the term of her natural life, such payments to be in lieu of her dower right in my estate, and from and after the death of my said wife, the said one-sixth share or part of said income shall be divided among the surviving devisees named in this my will in the shares and proportions hereinafter set forth and limited to each of them.

"One-sixth thereof to my son William during the term of his natural life, and from and after the death of my said son William, then to Melisa, the wife of said William, during the term of her natural life; and from and after the death of the said Melisa the said one-sixth share or part of said income shall be divided among the surviving devisees share and share alike.

"One-sixth thereof unto the children of my son Charles Notley Jr., named, John, Victoria, Maria, Lilly and William, share and share alike. And I hereby direct my said Trustees not to pay any of said share of the said income unto any of the above named children of my said son Charles Notley Jr. until such time as each of them, being males, shall arrive at the age of twenty-one years, and, being females, shall arrive at the age of eighteen years; and that in the meantime and until the happening of such event as to each of said children, I direct my said Trustees to keep said one-sixth share of said income invested in such securities as they or their successors may think proper, and the income, rents, issues or profits thereof shall be divided equally among said children upon the arrival of them at the

age of twenty-one and eighteen years respectively as hereinbe-fore limited. And in the event of the death of any of said chil-dren before the arriving at the ages aforesaid, or in the event of their death after the arrival at the ages aforesaid, the heirs of such children shall take the share of the child so dying.

"One-sixth thereof unto my daughter Maria, the wife of Thomas Hughes, during the term of her natural life, free from all control or liability of the marital rights of any husband.

"One-sixth thereof to my son David Fyfe Notley, during the term of his natural life, and

"One-sixth thereof to my niece Emma Danford, neé Mullinger, during the term of her natural life free from all control or liability of the marital rights of any husband.

"And from and after the death of all my said children and my said niece Emma Danford, neé Mullinger, I hereby direct my said Trustees or their successors to convey all of my estate among the heirs-at-law of my said children William, Maria, David Fyfe, and my said niece Emma Danford, neé Mullinger, and the children of my said son Charles Notley, Jr., namely:—John, Victoria, Maria, Lilly and William, share and share alike.

"And I direct, that until the death of all the legatees last named, the income accruing from said trust estate, shall, until such event happen, be paid among the heirs-at-law of all such as may have died before the death of the survivor of said last named legatees.

"In the event of the death, resignation or any disability of my said Trustees or either of them, I hereby direct the Court having jurisdiction of the Probate matters and wherein my will is probated to appoint a new Trustee or Trustees as the case may be.

"I hereby authorize and empower my said Trustees or their successors to make such changes and alterations in the nature and kind of investments of my estate and vary the same in such manner as in their discretion will result to the best advantage of said estate, and also to use, handle, control, invest and re-re-invest all property belonging to said estate in such manner as to them shall seem proper for the best interest of those inter-ested in said estate.

"In witness whereof, I have hereunto set my hand and seal this 18th day of May, 1899.

(Signed)    CHAS. NOTLEY.    (SEAL)

"Signed, sealed, published and declared by the said Charles

Notley as and for his last will and testament in the presence of us, who in his presence and in the presence of each other, and at his request, have hereunto set our hands as witnesses this 18th day of May, 1899.

"(Signed)    CECIL BROWN,

Honolulu.

"(Signed)    FRANK F. FERNANDES,

Honolulu.

"(Signed)    ALEX. ST. M. MACKINTOSH,

Honolulu."

"Codicil to the Last Will and Testament of me, Charles Notley, the elder, of Paauilo, in the District of Hamakua, Island of Hawaii, which bears date the 18th day of May, 1899.

"Whereas, by my said last will and testament I have appointed Thomas Rain Walker to be one of the Executors and Trustees thereof, and as the said Thomas Rain Walker intends to depart out of the Territory of Hawaii and reside in England, I am desirous that Cecil Brown of Honolulu, in the Island of Oahu, shall be substituted as a trustee and executor of my said Will, and to serve as such in the place of said Thomas Rain Walker.

"Now, therefore, I do hereby revoke the appointment of said Thomas Rain Walker as such executor and trustee, and do hereby nominate and appoint the said Cecil Brown to be an executor and trustee of my said last will and testament in the place and stead of said Thomas Rain Walker, and to serve as such without giving bonds.

"And I declare that my said last will and testament shall be construed and take effect as if the name of the said Cecil Brown were inserted therein throughout instead of said Thomas Rain Walker's name.    In all other respects I confirm my said Will.

"In witness Whereof I have hereunto set my hand and seal at Paauilo aforesaid, this 2nd day of August, 1900.

"(Signed)    CHARLES NOTLEY.

"Subscribed by the Testator in the presence of each of us, and at the same time declared by him to us to be a codicil to his last will and testament, and thereupon, we, at his request, sign our names hereto as witnesses, this second day of August, 1900.

"(Signed)    WM. H. SIEBECKER.
"(Signed)    J. LEONHART."

"This is a second codicil to my last Will and Testament which bears date the 18th day of May, 1899.

"First: I hereby ratify and confirm my said Will and the first codicil thereto in every respect, save and except so far as the said Will and codicil is altered by and is inconsistent with this codicil.

"Second: I hereby revoke the fourth clause or subdivision of my said Will on page two thereof, being the devise to my son David Fyfe Notley of my homestead lot or dwelling house and premises and household furniture, etc., and other property therein mentioned, and in place thereof,

"I give, devise and bequeath unto my niece Emma Danford, the wife of H. D. Danford, of Honolulu, in the Island of Oahu, all of that real property situate and being at Paauilo, in the District of Hamakua, Island of Hawaii, and Territory of Hawaii, at present occupied, used and enjoyed by me as my residence or homestead, and contains about four acres, together with all the household furniture, plate, silver-ware, linen and all and every other kind of fixtures and utensils therein or used in connection therewith, including the carriages, harnesses and horses used by me in said Hamakua, and being a part of my household property and generally used and enjoyed by me in connection therewith.

"To have and to hold the same unto the said Emma Danford, for her sole and separate use and behoof forever.

"Provided, however, and it is my wish, and I hereby declare that my wife Mary K. Notley shall have the use and occupation of the cottage that is upon said residence premises and which lies on the north side of the tennis grounds on said premises, together with all the use of the furniture and household fixtures in said cottage, for and during the term of her natural life.

"In Witness Whereof, I, Charles Notley, the elder, have hereunto subscribed my hand and seal at Honolulu, in the Island of Oahu and Territory aforesaid, this 11th day of April, 1902.

"(Signed)    CHAS. NOTLEY.    (SEAL)

"Subscribed by the said Charles Notley, the elder, in the presence of each of us, and at the same time declared by him to us to be the second codicil to his last will and testament, and thereupon, we, at his request, and in his presence hereto sign

our names as witnesses at Honolulu aforesaid, this 11th day of April, 1902.

> "(Signed)    CECIL BROWN,
>                        "Honolulu.
> "(Signed)    FRANK F. FERNANDEZ,
>                        "Honolulu."

The questions of facts framed by the contestants for the jury were as follows:

1.    "Are the documents dated May 18, 1899, August 2, 1900, and April 11, 1902.  *  *  *  the last will and testament of Charles Notley, deceased?"

2.    "Were such alleged will and codicils executed and published by the said Charles Notley under and by virtue of undue influence exercised by Emma Danford at the time of the execution and publishing thereof?"

The trial in the circuit court commenced on January 23, 1903, and ended five days thereafter by the verdict rendered by direction of the court.  Many witnesses were examined on behalf of the contestants.  The transcript of the evidence constitutes some four hundred typewritten pages besides numerous exhibits consisting of letters, contracts, deeds, etc.

The motion to direct the verdict was based on the ground that there was no evidence to support the theory of the contestants and presumably granted for that reason.

It is contended by the contestants that the arrival of Miss Mullinger wrought a distinct change in the Notley family—that it was contemporaneous with the springing up of discord and family bickerings that scattered the children from the homestead and caused the decedent to strike his wife, something he had never been known to do before, and finally ended in the installation of Miss Mullinger as mistress of the home and the location of the wife and mother in a small cottage in the yard; that Miss Mullinger usurped the place in the decedent's affections that of right belonged to the wife; that in all disagreements between Miss Mullinger and other members of the family, and these were not infrequent, the decedent uniformly sided with the former and against the latter; that for years prior to the execution of the will and up to the time of

decedent's death Miss Mullinger's wish was the law of the
Notley family and that the provisions of the will and codicils,
namely, that disinheriting the son, Charles, the clause tying
up the bequest to his children until the youngest becomes of
age, the bequest to Miss Barnard who had no claim on dece-
dent's bounty, and the codicil bequeathing the homestead to
Mrs. Danford instead of the wife, with the other evidence given,
demonstrates that the will and codicils admitted to probate ex-
press the wish and desire of Mrs. Danford and were not the
free and voluntary act of the decedent.

The evidence given, much of which is referred to in the ma-
jority opinion, tended in some degree to stablish many of these
contentions either directly or indirectly.

There can be no doubt from the evidence that Mrs. Danford
had ample opportunity to exercise undue influence over the dec-
edent and there is also testimony tending to show a disposition
to influence him against Charles and the mother providing she
had the power to do so.

The lawyer who wrote the will testifies that it is the free
and voluntary act of the decedent.   The will was executed
May 18, 1899, while Mr. Notley was stopping at Mrs. Dan-
ford's, on Kinau street, Honolulu, and following the visit of
Mrs. Danford to Hamakua in February, 1899, when she and
the decedent had tried to induce Charles to persuade his mother
to permit Miss Barnard to be installed in the house as governess.

It is in evidence that when this effort resulted in failure
Mrs. Danford said she would see that Miss Barnard was re-
membered in decedent's will.   It was only the preceding Octo-
ber, on the day before her marriage, that Mrs. Danford threat-
ened Charles in effect that she would see that he did not get
anything by "uncle's will".

The attorney who wrote the second codicil testifies relative
to its execution, in part as follows:

"He came into the office I think three or four times previous-
ly, and took the will, which was sealed in an envelope, he took
and read it over and told me to put it back with the other papers

in the safe, then he came on this day and told me he wanted to make a change.

"Q. How did he look?

"A. He was suffering from a very bad cough, the slightest exertion made him cough, otherwise he looked very well.

"Q. You knew him intimately for a number of years?

"A. Very intimately. I knew that he was down here on account of being ill, under treatment of Dr.          at the time for congestion of the lungs.

"Q. What would you suppose as to whether or not that man on that day was in full possession of his mental faculties?

"A. I am just as positive that he was in full possession of his mental faculties as I am here today.

"Q. And you drew that second codicil to the will absolutely in accordance with the old man's instructions?

"A. I did it with his instructions, the second codicil. I received my instructions from him. * * * * * *

"Q. Who was present at the time he signed the second codicil?

"A. Mr. Fernandez, I told Mr. Notley at the time; I noticed that he coughed so much, there was such a strain on him, I said: Mr. Notley, if you like I will bring this codicil up to the house where you are staying, and you can execute it there, it will save you from walking around so much; and he thanked me and said, 'That is all right, you are a good boy,' etc.

"Q. Who was present when you executed that second codicil?

"A. I, with Frank Fernandez, nobody else, Mrs. Danford wasn't there. The only time I saw her was when she brought some ink. He read the second codicil over himself, and I read it over to him."

This testimony certainly proves that the decedent was at least physically weak at the time of the execution of the second codicil and that his environment, at that time, was favorable to the exertion of undue influence as contended by the contestants.

The question presented by the exception under consideration is not whether the evidence shows that the will and codicils were executed under and by virtue of undue influence exercised by Mrs. Danford but whether there is any evidence from which the jury may have reasonably inferred that such undue influence was exercised.

"It is impossible to define or describe with precision and exactness what is undue influence; what the quality and the extent of the power of one mind over another must be to make it *undue,* in the sense of the law when exerted in making a will. Like the question of insanity, it is to some degree open and vague, and must be decided by the application of sound principles and good sense to the facts of each case. (*Lynch v. Clements,* 24 N. J. Eq. 431). But the influence exercised over a testator which the law regards as undue or illegal, must be such as to destroy his free agency; but no matter how little the influence, if the free agency is destroyed it vitiates the act which is the result of it." \* \* \* \* \* \*

"The undue influence is not often the subject of direct proof. It can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the conditions of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influence, the opportunity and disposition of the person to wield it, and the acts and declarations of such person." *Rollwagon v. Rollwagon,* 63 N. Y. 504, 519.

It was said by the Supreme Court of Michigan in deciding a recent case: "The principal question urged in the case, and pressed upon our attention with great vigor by proponent, is that of whether there was any evidence tending to show the exercise of undue influence which justified the submission of the case to the jury. It is undoubtedly true that the testimony relating to the exact time of the execution of this instrument strongly supports the proponent's case. The testimnoy of Judge Whipple, who drew the will, and of the witnesses who attested it, clearly demonstrates that, at the precise time of the execution of the will, no immediate, present influence was being exerted to control the mind and will of Dr. Reed. But this is not decisive of the case. If an unwarranted influence had been exerted theretofore, the effect of which still remained, and which was sufficient in fact to subordinate the will of Dr. Reed to that of Hannah Waters, this influence was undue, as much as though it were exerted at the very time the will was executed. See *Petter's Appeal,* 53 Mich. 106, (18 N. W. 575.) Indeed it is recognized by the authorities that undue influence is usually

exercised secretly, and in a clandestine manner; and, as was said by Mr. Justice Grant in *Rivard v. Rivard,* 109 Mich. 111 (66 N. W. 686, 63 Am. St. Rep. 570): " 'It is largely a matter of inference from facts and circumstances surrounding the testator, his character and mental condition as shown by the evidence, and the opportunity possessed by the beneficiary for the exercise of such control.' See also 1 Underh. Wills, §132." *Waters v. Reed,* 129 Mich. 131, 135, 136.

The motion to direct a verdict, like a demurrer to the evidence, admits not only the facts stated therein but also every conclusion or inference which a jury might fairly or reasonably infer therefrom. *Parks v. Ress,* 11 How. 362. "Such a motion, like a demurrer to the evidence, admits not only what the testimony proves, but what it tends to prove. The ultimate facts, in other words, are admitted." *Railroad Company v. Woodson,* 134 U. S. 614, 621.

"We do not think, therefore, that it is a proper test of whether the court should direct a verdict, that the court, on weighing the evidence, would, upon motion, grant a new trial. A judge might, under some circumstances, grant one new trial and refuse a second, or grant a second and refuse a third. In passing upon such motions he is necessarily required to weigh the evidence, that he may determine whether the verdict was one which might reasonably have been reached. But, in passing upon a motion to direct a verdict, his functions are altogether different. In the latter case we think he cannot properly undertake to weigh the evidence. His duty is to take the view of the evidence most favorable to the party against whom it is moved to direct a verdict, and from that evidence, and the inferences reasonably and justifiably to be drawn therefrom, determine whether or not, under the law, a verdict might be found for the party having the onus. If not, he should, upon the ground that the evidence is insufficient in law, direct a verdict against that party. * * * * * * We only wish to be understood as holding that whenever there is evidence of so positive and significant a character as, if uncontradicted, would support a verdict, it is the duty of the court to submit the case to the jury, under proper instructions. It is certainly not his function to weigh the evidence for the purpose of saying how

the verdict should go." *Railroad Company v. Lewery,* 74 Fed. 463, 477.

The case should be submitted to the jury unless the conclusion follows, as a matter of law, that no recovery can be had upon any view which can be properly taken of the facts the evidence tends to establish. *Dunlap v. Railroad Co.,* 130 U. S. 649.

"The motion at the close of plaintiff's evidence, for a peremptory instruction for the company was properly denied. It could not have been allowed without usurpation, upon the part of the court, of the functions of the jury. Where the cause fairly depends upon the effect or weight of testimony, it is one for the consideration and determination of the jury, under proper instructions as to the principles of law involved. It should never be withdrawn from them, unless the testimony be of such a conclusive character as to compel the court, in the exercise of a sound judicial discretion, to set aside a verdict returned in opposition to it." *Insurance Co. v. Doster,* 106 U. S. 30.

The rule is also expressed as follows: "If different minds might draw different conclusions or inferences from facts proved, the case should be left to the jury; and so, likewise, in the cases of doubt as to the proper inferences to be drawn." *Railroad Company v. Stout,* 84 U. S. 657; *Railroad Company v. Ives,* 144 id. 408, 417; *Railroad v. Gentry,* 163 id. 353, 368; *Beatty v. Life Assn.,* 75 Fed. 65, 68.

A careful examination of the voluminous record in this cause satisfies me that there was evidence which, unexplained and undenied, tended to prove that Emma Danford exerted undue influence over the decedent in the execution of the will and codicils. It certainly is clear that reasonable men might honestly differ in their view as to the effect of the facts proved and the inferences to be drawn therefrom. In my opinion it was impossible for the Circuit Judge to take the view of the evidence most favorable to the contestants, as the law demands he should, and direct a verdict for the proponents.

Notwithstanding the fact that the testimony relating to the exact time of the execution of the will and codicils fails to show

any immediate present influence being exerted to control the mind and will of the decedent, I cannot overlook the fact that Emma Mullinger, when a girl of thirteen, after a few weeks acquaintance with her uncle, the decedent, voluntarily left her home, father and mother and came to this far away land to live with him and from that time until his death was apparently very much attached to him and lost no opportunity to make a show of affection for him but as soon as he was dead permitted his body to be taken from her home, where he died, and the funeral services to be conducted from an undertaker's parlors; that she had an aversion for Charles Notley and his mother and that every prediction or threat made by her relative to the disposition of decedent's property was verified by the terms of the will when published and that she had ample opportunity to exert undue influence over the decedent. These with other incidents showing a disposition on the part of the decedent to yield to the wish of Emma Danford in many matters certainly tend to support the theory of the contestants.

The contestants certainly had the right to demand that the evidence be submitted to the jury and to have their free and fair judgment thereon. The denial of that right and the direction of the verdict by the Circuit Judge was a clear usurpation of the functions of the jury.

While the trial judge has the undoubted right to take a cause from the jury and to direct a verdict in certain cases, this power should be exercised with great care and caution. Under our system of laws the jury are the constituted triers of the facts. When a party elects a trial by jury he has the right to demand the judgment of the jury on the facts. The trial judge is frequently called upon to act upon the spur of the moment, without sufficient opportunity to analyze or consider the testimony. This fact alone should induce him to give the party against whom the motion is directed the benefit of every reasonable doubt and not to take the case from the jury unless his duty to do so is clear.

I am convinced that it was error for the Circuit Judge to

direct the verdict in this cause and that the exceptions ought to
be sustained.